Argued and submitted March 4, affirmed November 14, 2013, petition for review denied March 27, 2014 (355 Or 142)

CASCADE PACIFIC PULP, LLC,
*Plaintiff-Respondent,*

*v.*

GEORGIA-PACIFIC CONSUMER PRODUCTS LP,
*Defendant-Appellant.*

Linn County Circuit Court
091549; A148782

314 P3d 311

William F. Gary argued the cause for appellant. With him on the brief were Sharon A. Rudnick, J. Aaron Landau, and Harrang Long Gary Rudnick PC. On the reply brief

were Willam F. Gary, Sharon A. Rudnick, and Harrang Long Gary Rudnick PC.

James T. Waldron argued the cause for respondent. With him on the brief were Sara C. Cotton, Sara Kobak, and Schwabe, Williamson & Wyatt, P.C.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

SCHUMAN, P. J.

### SCHUMAN, P. J.

Plaintiff Cascade Pacific Pulp, LLC (Cascade) and defendant Georgia-Pacific Consumer Products LP (Georgia-Pacific) are the present owners of adjoining mills in Halsey, Oregon. The two mills, paper and pulp, were once part of an integrated facility with a single owner, and they share a common infrastructure, including a water treatment system and an effluent discharge system. After the two mills came under separate ownership (by the parties' predecessors-in-interest), disputes arose concerning the use of the shared infrastructure. The disputes were resolved in the early 1990s by way of a settlement and operating agreement, an easement agreement, and a later amendment to the easement agreement.

The present dispute between Cascade, which now owns the pulp mill, and Georgia-Pacific, which owns the paper mill, concerns the interpretation and effect of the easements and service rights granted in the early 1990s. Georgia-Pacific argues that, as part of the settlement, its predecessor obtained express easements in the pulp mill's process water and effluent lines, and that Cascade therefore is limited to charging cost-based rates for the use of the shared system. Cascade, meanwhile, argues that the easement agreements unambiguously *do not* grant Georgia-Pacific the easements and service rights that it claims, thereby allowing Cascade to charge market-based rates for the use of the pulp mill's process water and effluent lines. We agree with Cascade's understanding of the easement agreements and therefore affirm.

## I. BACKGROUND

A. *History of the Mills*

In 1968, American Can Company built a paper mill and a pulp mill in Halsey. The mills were constructed as part of an integrated facility on a single site with a common infrastructure. That infrastructure includes a water treatment system that draws from the Willamette River and treats and transports millions of gallons of process water each day for the two mills. The infrastructure also includes an effluent discharge system that conveys treated effluent back to the river.

By the mid 1980s, American Can Company had sold its interests in the mills. Pope and Talbot, Inc. (P&T) became the sole owner of the pulp mill by 1983, and by 1986, James River Corporation (James River) had taken over the paper mill. In the process, P&T and James River (or those parties' predecessors) had executed the Original Easement Agreement, Amended Easement, and Necessary Services Agreement to ensure that both mills continued to enjoy the use of the shared infrastructure. For a time, James River managed operations at both mills despite their separate ownership, and P&T's pulp mill sold process water and effluent discharge services to James River's paper mill pursuant to the written agreements.

In 1989, P&T took over the operation of its pulp mill as the relationship between P&T and James River turned acrimonious. Shortly after P&T took over the pulp mill, James River announced plans to terminate its pulp purchases from P&T; James River then terminated its contract to purchase steam from P&T. In response to those terminations, P&T announced that it was terminating all other services sold to James River as well, including the process water and effluent discharge services. The parties then entered into tense negotiations to resolve their differences.

## B. *The Settlement and Easements*

P&T and James River eventually settled their dispute with a series of agreements that addressed, among other issues, use of and access to process water and effluent discharge services. The documents memorializing their agreements—the 1991 Settlement and Operating Agreement, the 1991 Easement Agreement, and the 1993 Amendment—are at the center of this appeal.

### 1. *The Settlement and Operating Agreement*

In the Settlement and Operating Agreement (SOA), P&T and James River agreed to terminate the previous Necessary Services Agreement and instead to share services as provided in the SOA. Section 2.1 of the SOA ("Ongoing Necessary and Shared Services") states:

"P&T shall provide the services specified in Schedule 2.1A ('Ongoing Necessary Services'), the services specified in

> Schedule 2.1B ('Ongoing P&T Shared Services') and steam, as described in Schedule 2.1C ('Ongoing Steam Services'), to the Paper Facility, and [James River] shall provide the services specified in Schedule 2.1D ('Ongoing JR Shared Services,' and together with the Ongoing P&T Shared Services, 'Ongoing Shared Services') to the Pulp Facility. Such services shall be provided by P&T and [James River] in a manner consistent with the manner in which such services are being provided as of the date hereof and shall be provided at levels which are consistent with the historical consumption of such services by the Paper Facility or the Pulp Facility, as the case may be, prior to the date hereof * * *."

(Underscoring in original.) The levels of historical consumption were set forth in the cross-referenced schedules, which also included descriptions of the particular services within different categories. As pertinent here, the schedule for "Ongoing Necessary Services," Schedule 2.1A, identifies two services: (1) "Effluent Line" and (2) "Process Water." With respect to the effluent line, Schedule 2.1A states, "P&T maintains a pipeline to transport treated effluent from its aeration ponds to the Willamette River. [James River] will be permitted to run a pipeline from their secondary fiber plant and tie it into P&T's existing pipeline for discharge of [James River's] effluent along with P&T's." As for process water, Schedule 2.1A states, "A water filter plant and a filtered water distribution system is operated for the use of the total Halsey plant site (the combined Paper Facility and Pulp Facility)."

A different section of the SOA, Section 2.4 ("Compensation for Provision of Services") establishes how much the parties will pay one another for the shared services. Under paragraph (a) of that section, James River shall, on a monthly basis, "pay to P&T an amount equal to the sum of (i) P&T's costs in providing each the immediately preceding month (the 'Cost Portion'), plus (ii) an amount equal to 15% of such costs[.]" (Underscoring in original.)

In addition to setting forth the shared services and costs for those services, the SOA contemplated that the parties would execute easement agreements as part of the settlement. Section 4.2 of the SOA states,

"Easement Agreements. P&T and [James River] agree that on the Final Payment Date they shall enter into an Agreement of Easements and Covenants, in substantially the form attached hereto as Exhibit C (the '1991 Easement Agreement'), pursuant to which the parties shall (i) evidence the termination and supersession of the Original Easement Agreement, the Easement Amendment and the Necessary Services Agreement and (ii) in substitution therefor, *grant certain new easement rights to the respective parcels on which the Paper Facility and Pulp Facility presently sit.* As soon as practicable following the execution of the 1991 Easement Agreement, P&T and [James River] shall jointly cause such document to be recorded in the real property records of Linn County, Oregon."

(Emphasis added; underscoring in original.)

### 2. *The 1991 Easement Agreement*

As contemplated in the SOA, P&T and James River executed the 1991 Easement Agreement. The 1991 Easement Agreement provides that it is "being entered into pursuant to, and to carry out the purposes of, the Settlement and Operating Agreement * * *." Paragraph 1.G of the 1991 Easement Agreement further explains the parties' intent:

"To permit the continued use and benefit by [James River], its successors and assigns, of Parcel A [the paper mill] and the continued use and benefit by P&T, its successors and assigns, of Parcel B [the pulp mill], the parties have agreed that certain of the utilities, rights-of-way, parking, storage and other uses of property appurtenant to Parcel A or Parcel B utilized in connection with the operation of the pulp manufacturing and paper manufacturing facilities located thereon continue to be available for the respective owners of Parcels A and B."

Although the 1991 Easement Agreement conveys easements to both mills, the easements at issue in this case are those conveyed by the pulp mill to the paper mill—*i.e.*, from P&T to James River. Those easements are found in paragraph 3 of the 1991 Easement Agreement, which concerns the interests that "P&T hereby grants and conveys to [James River], for the benefit of [the paper mill]." They include:

"B.  An easement over [the pulp mill] for the use of such electric power, natural gas, liquid propane gas, process water, telephone and other communications lines and storage facilities located thereon as presently serve the business operations conducted [at the paper mill];

"* * * * *

"D.  To the extent necessary to carry out the terms of Section 2.1 of the [SOA], and only to such extent, an easement in the existing system for the disposal of treated effluent located upon [the pulp mill], to use same to discharge treated industrial effluent generated [at the paper mill];

"E.  An easement and right to enter upon, traverse and occupy [the pulp mill] in order to (1) install, repair, maintain, remove or replace anything reasonably necessary to the proper operations and protection of facilities located upon [the paper mill]; (2) install, repair, maintain, remove or replace anything reasonably necessary to the proper construction, operation and protection of fixed assets and facilities hereafter constructed on [the paper mill]; and (3) install, repair, maintain or replace any of the easements granted herein by P&T, <u>provided</u> that in no event shall such easement constitute a right to use or have access to any facilities located on [the pulp mill] necessary for the provision of steam or condensate return or for the processing of broke;

"* * * * *

"H.  A right of access over [the pulp mill] to the Willamette River for the intake and discharge of water necessary to conduct business operations [at the paper mill] as presently conducted[.]"

(Underscoring in original.) Paragraph 6 of the easement agreement then further qualifies the effluent-related rights granted in paragraph 3.D, stating,

"In the event that Section 2.1 of the [SOA] shall be amended, modified or terminated in any respect, the easements and rights of user granted at Sections * * * 3.D. hereof shall be automatically amended, modified or terminated to the same extent without any additional action on the part of the parties to this Agreement."

As for costs, the 1991 Easement Agreement provides that,

"[e]xcept as otherwise contractually provided for between the then current owners of [the paper mill] and [the pulp mill], costs of maintaining, repairing or replacing existing facilities subjected to joint user hereunder shall be pro-rated between the users as the use of each bears to the whole, and the costs of constructing and maintaining new facilities shall be borne by the benefitted user."

### 3. *The 1993 Amendment*

In August 1991, as the parties were finalizing the SOA and 1991 Easement Agreement, the attorney for P&T sent a letter to James River that broached the possibility of creating a map to represent the various easements conveyed by the 1991 Easement Agreement. The letter states,

"[P&T] has suggested that a map be prepared which shows the easements and other benefits and burdens relating to the Halsey facility that are presently covered by the Easement Agreement. They have begun preparation of such a map. *I suggest that, rather than formally attaching the map to the new Easement Agreement to be executed, the two parties execute a side letter agreement acknowledging the existence of the easements as they are shown on the map.*"

(Emphasis added.)

And here is where much of this case hinges: the map. As it turned out, a map of easements was not prepared until almost two years after the parties signed the 1991 Easement Agreement. In June 1993, P&T sent a letter to James River expressing amazement at "how long it takes to get some things wrapped up!" The letter continued,

"Back on August 2, 1991 we signed the current agreements in effect between James River and [P&T], including a copy (Exhibit C attached) of the Easement Agreement. At that time we agreed to have all of the easements documented on a facility map to simplify the understanding of the easements by all parties involved. Well, the map reviewed by the parties and put into final form is attached. Steve Tonsfeldt [attorney for P&T] drafted an amendment which makes this map a part of the 1991 Agreements as Exhibit 'A.'

"Will you please sign the copies of the Amendment and return a full set to me for our files and retain a set for your files. This should finalize the 1991 Agreements."

James River signed the 1993 Amendment shortly thereafter. The 1993 Amendment stated, in relevant part:

"A. P&T and [James River] have each entered into that certain Agreement of Easements and Covenants dated as of August 22nd, 1991 ('the 1991 Easement Agreement' attached hereto as Exhibit C) pursuant to which P&T and [James River] each granted the other certain easements, rights, benefits and burdens with respect to two adjacent parcels of land located in Linn County, Oregon.

"B. Paragraphs 2 and 3 of the 1991 Easement Agreement set forth certain of these easements, rights, benefits and burdens.

"C. P&T and [James River] now desire to amend such paragraphs to provide for certain other easements, rights, benefits and burdens with respect to such parcels of land.

"NOW, THEREFORE, in consideration of the foregoing, the parties agree as follows:

"1. The original Paragraph 2 of the 1991 Easement Agreement is hereby amended and restated to read in full as follows:

"'2. [James River] hereby grants and conveys to P&T, for the benefit of [the pulp mill], those easements, rights, benefits and burdens shown as being situated on the parcel owned by [James River] on the map attached hereto as Exhibit A.'

"2. The original Paragraph 3 of the 1991 Easement Agreement is hereby amended and restated to read in full as follows:

"'3. P&T hereby grants and conveys to [James River], for the benefit of [the paper mill], those easements, rights, benefits and burdens shown as being situated on the parcel owned by P&T on the map attached hereto as Exhibit A.'"

(Underscoring omitted.)

The map referenced in and attached to the amendment is a schematic of the two mills. It includes tags ("text tags") that identify rights-of-way and various easements on the map, and below the text tags are small encircled

numbers ("number tags"). By way of illustration, the text-tag and number-tag combination appears something like this:

EXISTING GAS &
TELEPHONE EASEMENT
(AGREEMENT LETTER
J.R.C. & P&T, INC.)

The number tags correspond to a section captioned "Notes" in the upper right corner of the map. The "Notes" part of the map includes the following text:

"5. The Original Easement Agreement, the Easement Amendment and the Necessary Services Agreement have been superseded in their entirety by a settlement and operating agreement dated August 9, 1991 between [P&T] and James River Paper Company, Inc.

"The following references are detailed in the above agreement:

"* * * * *

"⟨10⟩  Ref. Page C-3, Paragraph 3B

"* * * * *

"⟨12⟩  Ref. Page C-4, Paragraph 3D

"* * * * *

"⟨16⟩  Ref. Page C-4, Paragraph 3H[.]"

(Uppercase omitted.) Three of the cross-referenced paragraphs—3B, 3D, and 3H—are the paragraphs of the 1991 Easement Agreement that, as recited above, refer to effluent lines and process water.[1]

The wrinkle, however, is that not everything that was recited in the 1991 Easement Agreement appears on the map in a text tag or number tag. Moreover, the text tags do not always describe everything that is cross-referenced

---

[1] Although the "above agreement" refers to the SOA, the 1991 Easement Agreement was attached as an exhibit to the SOA.

in the accompanying number tag. For instance, paragraph 3.B of the 1991 Easement Agreement (referenced in number tag "10") grants the paper mill an easement over the pulp mill for the use of "electric power, natural gas, liquid propane gas, process water, telephone and other communications lines and storage facilities located thereon as presently serve the business operations conducted on [the paper mill]." The text tag on the map that accompanies number tag 10, however, refers to "existing gas & telephone easement"—with no mention or depiction of process water lines. Likewise, paragraph 3.D of the 1991 Easement (referenced in number tag "12") grants the paper mill "an easement in the existing system for the disposal of treated effluent," but the related text tag refers only to "J. R. C. effluent monitoring bldg & effluent tie-in." The pulp mill's process water lines and effluent discharge system are not otherwise delineated anywhere on the 1993 map.

## C.  *The Present Dispute*

### 1.  *Rejection of the SOA through bankruptcy*

The discrepancies between the 1993 map and the 1991 Easement Agreement apparently did not cause any trouble between James River and P&T, presumably because the parties' relationship—and the cost of shared services between them—was governed by the SOA. Circumstances changed, though, after P&T filed for bankruptcy in 2007. During the bankruptcy proceedings, the U.S. Trustee rejected all of P&T's executory contracts, including the SOA. Cascade, the plaintiff in this case, later purchased the pulp mill out of that bankruptcy in 2008. The sale was expressly subject to all easements of record, including the 1991 Easement Agreement, as amended in 1993, but Cascade was not bound by the then-rejected SOA.

By the time that Cascade purchased the pulp mill, Georgia-Pacific, the defendant in this case, had become the owner of the paper mill. Initially, Cascade continued to provide Georgia-Pacific with access to and use of the shared facilities, including process water at the same price specified in the SOA—cost plus 15 percent, or approximately $.28 per hundred cubic feet (CCF)—even though the parties were

no longer bound by that agreement. In subsequent months, Cascade and Georgia-Pacific attempted to negotiate terms to govern the price of shared services, but they were unable to reach a new agreement. Then, in December 2008, Cascade imposed a price change for process water, increasing the rate significantly—from $.28 per CCF to $2.10 per CCF.

### 2. *Proceedings below*

#### (a) Pleadings

Georgia-Pacific refused to pay the increased rate, and Cascade eventually filed this action, alleging claims for breach of contract, account/services rendered, *quantum meruit*, and declaratory judgment.[2] In the breach of contract claim, Cascade alleged that Georgia-Pacific had accepted Cascade's services after December 1, 2008, and had not paid the charged rates when payment was due. Cascade alleged that, as of December 31, 2010, the amount owing was more than $3.4 million. The claims for account/services rendered and *quantum meruit* alleged the same damages under different theories.

In its fourth claim, Cascade sought a declaratory judgment. Cascade alleged that a present controversy existed between Cascade and Georgia-Pacific "as to the prices [Cascade] may charge [Georgia-Pacific] for services rendered." Cascade further alleged that "[t]here is no agreement between the parties that limits [Cascade's] right, as the supplier, to charge defendant commercial market prices for services rendered. Nor does any agreement exist that dictates that [Cascade] shall only charge fees based on actual costs of providing service." Accordingly, Cascade requested a declaration that "[Cascade] may charge defendant commercial market prices for services and is not limited to charging defendant based on actual costs to provide services."

Georgia-Pacific responded with nine counterclaims, only one of which is relevant to our decision on appeal.[3]

---

[2] Georgia-Pacific initially filed an action against Cascade in federal court but voluntarily dismissed that action after Cascade filed this action in state court.

[3] The remaining counterclaims included a claim seeking a declaration that Georgia-Pacific "is required to pay only a reasonable rate for the services provided by Cascade and that this rate should be based on Cascade's actual costs to provide such services"; breach of contract and declaratory judgment claims

Georgia-Pacific's fourth counterclaim requested a declaration concerning various rights and obligations under the 1991 Easement Agreement, as amended in 1993. The counterclaim alleged that Georgia-Pacific and Cascade disagreed as to whether, by reason of the 1991 Easement Agreement and 1993 Amendment,

- Cascade is obligated to provide process water services to the paper mill;

- Georgia-Pacific has the right to access the facilities located at the pulp mill, including the Water Supply Treatment Facility, so as to ensure the continued supply of the process water to the paper mill;

- Cascade may not interfere with Georgia-Pacific's use of the existing lines that cross the pulp mill and other properties to convey treated effluent to the Willamette;

- Georgia-Pacific has the right to access the existing pipes that cross the pulp mill and other properties to ensure its ability to continue to convey treated effluent to the Willamette; and

- In the event that Georgia-Pacific were to install a process water treatment facility at the Paper Mill, Georgia-Pacific has the right to access the existing pipes that cross the pulp mill and other properties for the purpose of ensuring a water supply to the paper mill.

Georgia-Pacific asked the court to declare which of the parties' competing contentions in those respects were correct.

### (b) Trial court rulings and jury verdict

The parties tried their claims and counterclaims simultaneously to the court and the jury over six days. During that time, both parties presented evidence regarding the history of the easement agreements between the mills. Cascade presented, among other witnesses, Wayne Henneck, a former manager for P&T and the current CEO

---

concerning amounts that Cascade had refused to pay for natural gas and security services, based on what Cascade believed to be an appropriate setoff for process water and effluent discharge costs; claims requesting that the court declare implied easements; a claim for breach of the covenant of good faith and fair dealing; a claim for reformation of the 1993 Amendment and map; and a claim requesting a declaration that Georgia-Pacific has an irrevocable license to access and use the process water and effluent discharge systems.

of Cascade and general manager of its pulp mill. Henneck testified that he had assisted in drafting the 1993 map by "help[ing] the drafts person locate some tags on the map but that was it." He was not told the purpose of the references.

Georgia-Pacific did not call any of its own witnesses regarding the drafting of the 1991 Easement Agreement or the 1993 Amendment. Rather, it recalled Henneck to the stand, and he testified as follows:

"[HENNECK]:   I helped the drafts person as to where the tags should go on the map, and the—the tags for the— number 16 I think it was in the lower left-hand corner for the river that you were focused on a second ago, * * * it's been 20 years ago, but I specifically remember talking about that location with the drafts person and where do you put it on the map because the river is not on the map, so I thought, well, the river kind of is down in this area over here so let's just put it there, and that's how it ended up in that corner.

"[COUNSEL]:   As opposed to where any easement to the river might be?

"[HENNECK]:   Right.

"[COUNSEL]:   But beyond helping a draftsman put some tags on the map you didn't know what the intent of the map was at the time, did you?

"[HENNECK]:   That's all I knew.

"[COUNSEL]:   All you knew was you're supposed to help put some tags on a map but you didn't know what it was about, what it was for?

"[HENNECK]:   I didn't know the details behind it."

At the close of the evidence, the trial court determined which of the various claims and counterclaims would be decided by the court, and which of them would be sent to the jury. Ultimately, the trial court ruled that Georgia-Pacific's fourth counterclaim, which sought declarations as to the rights and obligations of the parties under the easement agreements, should be decided by the court. The court also decided the merits of that counterclaim first, describing it as "really kind of the meat of it," which "sort of drives the rest of the rulings, frankly, because they're all based on similar theories."

In its oral explanation of its reasoning, the trial court remarked on various aspects of the easement and settlement agreements, but we understand the court's analysis to have turned on this inquiry: Which rights and obligations did the original parties, P&T and James River, intend to "run with the land," and which did they intend to be negotiated by successors in interest? In drawing a line between the two, the court noted that "the effluent lines were handled a bit differently than everything else," in that the easement rights were expressly tied to the terms of the SOA. The court explained that, as a result of the bankruptcy proceeding, which relieved Cascade of the obligation to perform under the SOA,

> "there's an argument that the paper mill doesn't have the right to use the effluent lines anymore pursuant to that one paragraph [paragraph 6] that says that. It says that if the—if paragraph 2.1 of the S and O is cancelled or whatever then—then the easement changes too as to the effluent line, so that's another reason. And it doesn't all apply necessarily to the part of the fourth counterclaim [that concerns the right to access the facilities at the pulp mill, including process water] but it certainly explains the Court's thinking on the whole nine yards."

The court then expanded on its reasoning:

> "To summarize that thinking on the interpretation of all the documents and history and everything else, yes, there are real estate easements which still exist on the map there. Does everything on the map still exist? No. *Just the part of the things that would run with the land as anticipated by the easement itself, not the kind of things that would be in the S and O agreement necessarily between the two mills themselves that were personal to them, would not necessarily run with the land.* * * *

> "* * * [*I*]*t's clear to the Court that price, quantity, duty to supply, those are gone, those no longer apply in this case.* It gets a little bit trickier when you get down to the point I raised with the attorneys when you were arguing this morning, is, well, what about a shared pipeline, which there are some here. You've got the real property easement per se saying that you can use it, but to what extent, and do you have the right to interfere with the other person's use * * *. [Georgia-Pacific will argue] they did raise * * * right

to access the existing pipes, not a real estate easement to run pipes but the right to access the existing pipes, and that one, frankly—that one, frankly is a liner for the Court based on my analysis that I just made about the map. I guess I've got to make a choice and let the smart judges at the Court of Appeals sort it all out later *but I would say that one is—falls on the S and O part, because under the S and O agreement that's where we get the mutual 'we promise to supply' stuff, 'we promise to supply in this quantity, at least this quantity and no more than that quantity,' you know, 'If you keep doing your part we'll keep doing our part.' That seems like it falls on that side of the line, that it's an S and O issue between those existing parties and not necessarily something that would be—run with the land, perhaps the right to run the pipe across the pulp mill to get to the river does not but the use of the line.*"

(Emphasis added.)

After the court explained the basis for its ruling, Georgia-Pacific specifically directed the court to paragraph 3.B of the 1991 Easement Agreement. Georgia-Pacific explained that paragraph 3.B "does have a tag, or at least there is a reference in the upper right-hand corner" of the 1993 map. Georgia-Pacific argued that the paragraph directly undermined the court's line-drawing effort:

"[J]ust for the record, Your Honor, it seems to us that [the easement described in paragraph 3.B] is an easement that runs with the land. *** [W]e've got the word 'the use of' and I don't know how that is something that is limited to what happened in the Settlement and Operating Agreement."

At that point, Cascade conceded that paragraph 3.B described easements that would run with the land, but argued that all of original paragraph 3, including paragraph 3.B, was "expressly deleted" from the 1991 Easement Agreement by the 1993 Amendment. The map was substituted in place of those sections, Cascade explained, and the map, while mentioning existing gas and telephone easements, "does not refer to processed water." The trial court then adhered to its previous ruling, stating, "I think that's an open issue that I can't—I can't close in this case. *** I appreciate the argument, but *** I'm still thinking

I'm going to stick with where I'm at"—that is, ruling that Georgia-Pacific does not have an easement in the existing facilities for process water or effluent discharge.

Based on that analysis of the fourth counterclaim, which the court used as a "springboard" for deciding other claims, the court resolved various other claims in favor of Cascade and sent the remainder to the jury. As to the latter claims, the court instructed the jury that, as a result of "the Court's rulings on the legal issues involved in the case[,] the jury should not consider the [SOA] and the easements as controlling on the issue of price of services, quantity for services, or the obligation to provide services between the two mills[.]" The jury ultimately returned a verdict in favor of Cascade on its claim for *quantum meruit,* determining that the reasonable value of the process water and effluent discharge services was $1.60 per CCF. The jury either rejected or made no award with regard to the other claims and competing counterclaims.

### 3. *Issues on appeal*

Georgia-Pacific appealed the ensuing judgment and now advances three interrelated and alternative assignments of error: (1) The court erred in concluding that the 1991 Easement Agreement, as amended in 1993, "does not unambiguously provide [Georgia Pacific] with easement rights for access to and use of the facilities." (2) Assuming there is some ambiguity in the 1991 Easement Agreement, as amended in 1993, the court erred in not submitting the meaning of the agreement to the jury. And (3), assuming both that the agreement is ambiguous and that the ambiguity should have been resolved by the court, the trial court applied the wrong interpretive methodology. Cascade, for its part, argues that the 1991 Easement Agreement, as amended in 1993, unambiguously does not give Georgia-Pacific any express easement or service rights in Cascade's process water and effluent discharge systems; even assuming some ambiguity, Cascade argues, "[Georgia Pacific] has not satisfied its burden to show that no evidence in the record supports the trial court's explicit and implicit factual findings in resolving such alleged ambiguities against [Georgia Pacific]."

## II.  ANALYSIS

The question before us is whether the trial court erred in concluding, as a matter of law, that Georgia-Pacific does not have easement rights in the existing process water lines and effluent discharge system located on Cascade's pulp mill. That question, in turn, revolves around the interpretation of the 1991 Easement Agreement, as amended in 1993. And, for the reasons that follow, we conclude that, based on the unambiguous language of the easement agreements, the trial court correctly ruled that Georgia-Pacific had no easement or service rights in the effluent discharge system or process water lines.

### A.  *Applicable law*

Although Georgia-Pacific suggests otherwise, the interpretation of an express easement is a question of law to be decided by the courts. *Bloomfield v. Weakland*, 224 Or App 433, 446, 199 P3d 318 (2008), *rev den*, 346 Or 115 (2009) ("The interpretation of an express easement is a question of law for the court."). In construing an easement, a court's task is to "discern the nature and scope of the easement's purpose and to give effect to that purpose in a practical manner." *Bloomfield*, 224 Or App at 447. The court must "look first to the words of the easement, viewing them in the context of the entire document." *Kell v. Oppenlander*, 154 Or App 422, 426, 961 P2d 861 (1998). The court is to consider the words of the agreement in the context of "'the circumstances under which it was made, including the situation of the subject and of the parties * * * so that the judge is placed in the position of those whose language the judge is interpreting.'" *Miller v. Jones*, 256 Or App 392, 397, 302 P3d 812 (2013) (quoting ORS 42.220); *see also Connall v. Felton*, 225 Or App 266, 272, 201 P3d 219, *rev den*, 346 Or 257 (2009) ("To determine whether a term in a document is ambiguous, the court can consider evidence of the circumstances surrounding its execution.").

If, after that inquiry, the court determines that the agreement's provisions are ambiguous, extrinsic evidence of the surrounding circumstances can be used for a slightly different aim: to resolve the ambiguity. *See Tipperman v.*

*Tsiatsos*, 327 Or 539, 545, 964 P2d 1015 (1998) ("If the wording at issue is uncertain or ambiguous, then the court must determine the intent of the original parties by examining the relevant surrounding circumstances."). In this context, where a party requests a declaration as to the existence and scope of an easement, it is the court—not the jury—that considers that extrinsic evidence and resolves any factual disputes as to that evidence. *E.g., Tipperman*, 327 Or at 545. If, after considering extrinsic evidence, the court still is unable to resolve the ambiguity, the court employs any relevant maxims of construction. *Id.* (explaining that a maxim of construction should have been used to resolve the interpretation of an easement agreement only if "any ambiguity * * * remains after all other tools for resolving it have failed").

B. *The 1991 Easement Agreement, as Amended in 1993*

In its briefing to this court, Georgia-Pacific combines its discussion of easements related to the effluent discharge system and process water under a single rubric ("access to and use of the Facilities"). However, because the easement agreements treat process water and effluent discharge differently, we elect to discuss them separately.

1. *Process water lines*

Georgia-Pacific's claim to an easement in the pulp mill's process water lines derives from language in "original Paragraph 3 of the 1991 Easement Agreement"—specifically, paragraph 3.B, which granted an easement "over Parcel B [the pulp mill] *for the use of* such electric power, natural gas, liquid propane gas, *process water*, telephone and other communication lines and storage facilities located thereon as presently serve the business operations conducted on the Parcel A [the paper mill.]" (Emphasis added.) Although Cascade contends that paragraph 3.B should be understood as conveying an easement in a strip of land, and not as an easement in the lines themselves, we are not persuaded by that argument. The plain text of the paragraph grants an easement over the pulp mill "for the *use*" of process water, which, in the broader context of the relationship between the two mills, could be understood as

referring to an easement in the shared process water facilities, as Georgia-Pacific contends.

The problem for Georgia-Pacific, however, is that original paragraph 3 of the 1991 Easement Agreement is no longer an operative provision of that agreement. Although there is extrinsic evidence that suggests that the 1993 Amendment by James River and P&T was intended merely "to have all of the easements documented on a facility map to simplify the understanding of the easements by all parties involved," that purported intent is not borne out in the text of the 1993 Amendment itself. *See Minto v. Salem Water Etc. Co.*, 120 Or 202, 210, 250 P 722 (1926) (extrinsic evidence cannot be used to contradict unambiguous language; "[i]t is the duty of the court to declare the meaning of what is written in the instrument, not of what was intended to be written"). Rather, the recitals in the 1993 Amendment state that "P&T and [James River] now desire to amend [paragraphs 2 and 3 of the 1991 Easement Agreement] to provide for certain *other* easements, rights, benefits and burdens with respect to such parcels of land." (Emphasis added.) The 1993 Amendment then expressly states that "original Paragraph 3 of the 1991 Easement Agreement is hereby amended and restated to *read in full*" as follows:

> "'3.    P&T hereby grants and conveys to [James River], for the benefit of Parcel A, those easements, rights, benefits and burdens *shown as being situated on the parcel owned by P&T on the map attached hereto as Exhibit A.*'"

(Emphasis added.) Thus, as of 1993, the provisions of original paragraph 3—including paragraph 3.B—were unambiguously replaced by the new paragraph 3, which set forth "other" easements. The "other" easements granted by P&T under that new paragraph were limited to "those easements, rights, benefits and burdens *shown as being situated on the parcel owned by P&T on the map attached hereto* * * *.*" (Emphasis added.)[4]

---

[4] Based on extrinsic evidence and the "Notes" section of the map, which cross-references many of the paragraphs in the 1991 Easement Agreement, Georgia-Pacific initially argues that "[t]he express easement rights granted under the 1991 Easement Agreement are, in letter and in substance, unchanged by the 1991 Amendment to that Agreement"—*i.e.*, Georgia-Pacific argues that the map simply restates and incorporates everything in the 1991 Easement Agreement.

The question, then, reduces to whether an easement in the process water lines is "shown as being situated" on the pulp mill on the 1993 map. It is undisputed that the process water lines themselves are not depicted anywhere on the 1993 map. (In its reply brief, Georgia-Pacific notes that the "map's illustration of the grounds mysteriously omits the water facilities themselves.") Nor is there a text tag anywhere on the map that refers directly to the pulp mill's process water lines. The only possible reference to an easement in the pulp mill's process water lines is by way of a number tag—"10"—that appears on the map under the text tag, "Existing gas and telephone easement (Agreement letter J.R.C. & P&T, Inc.)." *See* 259 Or App at 357 (showing that tag combination). Number tag 10 corresponds to paragraph 3.B—the superseded provision of original paragraph 3 that concerned process water, among other things.

Viewed in context, however, that number tag does not plausibly incorporate the entirety of original paragraph 3.B, which would include easement rights that do not otherwise appear anywhere on the 1993 map. Again, the text of the 1993 Amendment conveys only those easement rights "shown as being situated on the parcel owned by P&T on the map," and there is nothing on the map that shows or even suggests where a process water system might be situated on the pulp mill. The only plausible purpose of the number tag, in context, is to further detail those easements that *are* shown as being situated on the map: the existing gas and telephone easements described in the accompanying text tag. Easements over gas and telephone lines, like process water, were described in original paragraph 3.B, and the cross-reference can only plausibly be understood to refer back to the part of paragraph 3.B pertaining to gas and telephone lines, as shown on the map. Thus, we agree with Cascade that the 1991 Easement Agreement, as amended by the 1993 Amendment, unambiguously *does not* encompass

---

Again, while there is extrinsic evidence that is consistent with that view, it simply does not square with the text of the 1993 Amendment or the face of the map. Although the Notes section of the map cross-references most of the paragraphs of the 1993 Easement Agreement, two paragraphs—2.E and 3.E—are not cross-referenced at all. Given the text of the 1993 Amendment and the map, the Notes section cannot plausibly be read as incorporating, verbatim, the text and substance of the entire 1991 Easement Agreement.

easement rights in the pulp mill's existing process water lines.[5]

## 2. *Effluent discharge system*

The effluent discharge system, as the trial court observed, was treated differently from other easements in the 1991 Easement Agreement. And, unlike the purported easements in the process water system, there is at least a plausible argument that the 1993 map depicts easement rights in the effluent discharge system itself. The map contains a text tag that refers to "J.R.C. effluent monitoring bldg & effluent tie-in," which is accompanied by two related number tags, "4" and "12." Tag 4 cross-references a paragraph conveying easement rights to the pulp mill, but tag 12 cross-references paragraph 3.D of the 1991 Easement Agreement, which granted the paper mill "an easement in the existing system for the disposal of treated effluent" to "the extent necessary to carry out the terms of Section 2.1 of the [SOA], and only to such extent[.]" Read together, and in the broader context of the parties' relationship, the text and number tags on the map arguably show the paper mill's easement rights in the pulp mill's effluent discharge system.

However, as the trial court correctly noted, the 1991 Easement Agreement, as amended, put express limitations on those easement rights. Section 6.1 of the 1991 Easement Agreement, which was not amended in 1993, provides, "In the event that Section 2.1 of the Settlement and Operating Agreement shall be amended, modified or terminated in any respect, *the easements and rights of user granted at \* \* \* Section 3.D hereof shall be automatically amended, modified or terminated to the same extent without any additional action on the part of the parties to this Agreement.*" (Emphasis added.)

There is no dispute on this record that, as of the U.S. Trustee's rejection of the SOA during P&T's bankruptcy,

---

[5] There is a text tag on the map that refers to "JR Access to Willamette River for Intake and Discharge of Water," along with a number tag that cross-references paragraph 3.H of the 1991 Easement Agreement. Georgia-Pacific does not develop any argument regarding that text, which appears to grant only a right to access the river, and not easement or service rights in the existing facilities themselves. Accordingly, we do not discuss it further.

Cascade, the owner of the pulp mill, is not bound by Section 2.1 of the SOA and has no obligation to supply shared services—including effluent discharge services—under that provision of the SOA. *See* 11 USC § 365(g) (authorizing the trustee to "assume or reject any executory contract or unexpired lease of the debtor," subject to certain conditions). The trial court reasoned, and Cascade now argues, that any potential easement in the effluent discharge system was terminated along with the U.S. Trustee's rejection of the SOA.

In response to that contention, Georgia-Pacific argues that Cascade misstates the effect of a trustee's rejection of a contract under the bankruptcy code. Georgia-Pacific contends that "[r]ejection is no more than the trustee's decision not to make the estate a party to the executory aspects of one of the debtor's contracts—just as any third party can decide not to assume another party's contractual obligation." In Georgia-Pacific's view, the trustee's decision not to assume the SOA had no effect whatsoever on the existence of the contract and its obligations.

We appreciate that, in other contexts, a trustee's rejection of the SOA will not be treated as a termination of the contract. Here, however, there is no dispute that, after Cascade purchased the pulp mill out of bankruptcy, the SOA no longer governed the rights and obligations between the owner of the pulp mill and the owner of the paper mill. The 1991 Easement Agreement, as amended in 1993, conveyed, at most, easement rights in the effluent discharge system to "the extent necessary to carry out the terms of Section 2.1 of the [SOA], *and only to such extent*[.]" (Emphasis added.) That provision, coupled with the automatic modification/termination provision in Section 6 of the agreement, leaves no doubt that the original parties to the agreements intended to couple whatever rights were being conveyed in the effluent discharge system with Section 2.1 of the SOA. In these circumstances, we conclude that, as a consequence of the bankruptcy process, the SOA was terminated for purposes of Section 6 of the agreement: Section 2.1 no longer governed the rights and obligations of the pulp mill and paper mill. Indeed, Georgia-Pacific does not explain why, now that the terms of Section 2.1 of the SOA are no longer being carried

out at all, the paper mill nevertheless has easement rights to "the extent necessary to carry out the terms of Section 2.1 of the [SOA]." Thus, we agree with the trial court's conclusion that Georgia-Pacific does not have easement rights in Cascade's effluent discharge system.

In sum, we conclude that the 1991 Easement Agreement, as amended in 1993, unambiguously does not grant Georgia-Pacific any easement rights in Cascade's process water lines; we further conclude that, even if the easement agreements could be read to grant Georgia-Pacific easement rights in the existing effluent discharge system, those easement rights did not survive P&T's bankruptcy proceedings. We therefore reject each of Georgia-Pacific's assignments of error and affirm the judgment in favor of Cascade.

Affirmed.